

The following constitutes
the order of the court. Signed April 6, 2017

_____
Charles Novack
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br>SHARON L. BRUCE AND REY H. BRUCE,<br>       Debtors. | Case No. 14-44187 CN<br>Chapter 7 |
| BITMICRO NETWORKS, INC. AND BITMICRO NETWORKS INTERNATIONAL, INC.,<br>       Plaintiffs,<br>vs.<br>REY H. BRUCE,<br>       Defendant. | Adversary No. 15-4047 CN<br>**MEMORANDUM AFTER TRIAL** |

On February 7, 2017, this court commenced a four day trial in the above adversary proceeding. All appearances were noted on the record. Plaintiffs Bitmicro Networks, Inc. and its wholly owned Filipino subsidiary, Bitmicro Networks International, Inc., assert that debtor and defendant Rey Bruce tortiously interfered with their operating agreement after they terminated him as their chief operating officer and removed him from their board of directors, and that the resulting damages are non-dischargeable under Bankruptcy Code § 523(a)(6). Rey Bruce, who founded both entities, denies the allegation, and vigorously asserts that his conduct (which led to the brief closure of the subsidiary) was wholly justified. This court disagrees, and awards damages as described below.

1

The following constitutes this court's findings of fact and conclusions of law:

**The Facts**

In 1995, Rey Bruce (Bruce) and his brothers founded Bitmicro Networks, Inc. (Bitmicro), a technology company headquartered in Fremont, California. Rey Bruce, a trained electrical engineer, was Bitmicro's president, CEO, and chairman of its board, and he and his family members owned a significant percentage of Bitmicro stock, occupied many of Bitmicro's executive positions, and (initially) controlled its board of directors. Bitmicro initially developed a solid state storage device which it sold to the U.S. military. While this generated several million dollars in annual revenue, this income was insufficient to finance Bitmicro's primary mission, which was develop, produce and market its "Toleno" integrated chip (a flash memory controller). In order to lower its operating costs, Bitmicro, in 2002, created Bitmicro Networks International, Inc. (BNII) in the Philippines.[1] Bitmicro eventually moved all of its research and production facilities to BNII, and in 2005 the two companies executed a lengthy Service Agreement to memorialize their exclusive business relationship. The Service Agreement gave Bitmicro near absolute control over its subsidiary. BNII provided goods and services to Bitmicro only, and Bitmicro owned all of BNII's intellectual property (which BNII could not assign, transfer or license). Bitmicro also was BNII's sole source of revenue and financing. Under the Service Agreement, Bitmicro reimbursed its subsidiary for its costs (a defined term) and agreed to pay it an additional 5% of those costs during each reporting period. To ensure steady and sufficient payment, BNII was required to provide regular cost reports to its parent. In 2009, Rey became BNII's president and chairman of its board of directors, which was otherwise controlled by the Bruce family and persons loyal to them.

Bitmicro's capital needs were ever present. While the Bruce family financed the corporation's initial start-up years, its appetite for capital quickly outgrew the Bruces' financial resources. By 1998, Bitmicro had attracted $15 million in financing from friends, family and

---

[1] Bitmicro owned virtually all of BNII stock. Under Filipino law, each member of BNII's board of directors was required to be a shareholder. To satisfy this corporate requirement, BNII board members each held a single "nominee" share of stock in trust for Bitmicro. If a board member was removed, Bitmicro was authorized under the trust agreement to terminate that board member's interest in the nominee share of stock.

2

Case: 15-04047    Doc# 99    Filed: 04/06/17    Entered: 04/06/17 16:52:29    Page 2 of 14

scattered investors. Additional financing, however, dried up after the 2000 tech bubble burst. Bitmicro ultimately found two investors - William Carson and Alex Rankin - who, between 2002 and 2013, invested approximately $30 million on the promise of the Toleno chip technology. During this period, Carson and Rankin were virtually Bitmicro's sole source of capital, and they collectively owned a significant percentage of Bitmicro stock and eventually controlled its board of directors.

2013 was a pivotal year for Bitmicro and BNII. Since 2011, Bitmicro had repeatedly represented to its investors that the Toleno chip was nearly ready for fabrication and production. These representations were routinely followed by corrective statements which extended the fabrication and production time line. Bitmicro was losing money, and its continued existence wholly depended on regular cash infusions from Carson and Rankin. Carson and Rankin now controlled the Bitmicro board, and they began to question whether the Toleno chip was viable and if a change of management was necessary. By this time, Bitmicro employed approximately 20 - 25 employees, most of whom were Bruce family members. BNII had approximately 300 employees, and it conducted all of the research and development for the Toleno chip, maintained the servers used by both it and Bitmicro, and controlled all of Bitmicro's IT, email, and accounting and management software.

Carson and Rankin's concerns reached a head in the spring of 2013. On March 4, 2013, Bitmicro gave a presentation regarding the Toleno chip's status, which disclosed that - at best - the chip was still many months from fabrication and production. After the presentation, some of the attendees, including Carson's influential investment advisor, questioned whether the chip would ever be ready for production. In early May 2013, Carson and Rankin met with Bruce and requested that he resign as an officer and director of Bitmicro and refrain from voting his common stock. If Bruce accepted the offer, Carson and Rankin informed him that he would remain as an employee and continue to receive his salary[2]. Carson and Rankin advised him that they would stop funding Bitmicro's operations if he rejected the offer. Bruce agreed to step down if Bitmicro replaced him with his nephew, who was Bitmicro's vice president of operations. Rankin and Carson rejected his

---

[2] The term of this reduced employment, however, was not clear.

Case: 15-04047  Doc# 99  Filed: 04/06/17  Entered: 04/06/17 16:52:29  Page 3 of 14

counter-offer, and the Bitmicro board thereafter terminated Bruce as Bitmicro's president and CEO during its May 30, 2013 board meeting and additionally sought to terminate him from "all other positions within the Company and with the Company's subsidiaries." While the Bitmicro board withdrew its motion to terminate his BNII employment after Bruce contested its authority to do so, Bruce was on express notice of Bitmicro's intent, as the holder of more than 99% of BNII's shares, to remove him from all positions of authority with its subsidiary.

Bitmicro and Carson also began exerting significant financial pressure against Bruce, which directly led to Bruce's August 30, 2013 bankruptcy filing. In March 2007 Bitmicro issued and sold 673,784 shares of Bitmicro common stock to Bruce for $136,757.00. Bruce fully financed this purchase by executing a "Secured Full Recourse Promissory Note" which required that he fully pay the note, with 4% interest, by March 5, 2010. Bruce also signed a "Stock Pledge Agreement" which secured the promissory note with his newly purchased stock. While Bitmicro extended the note's maturity for three years in 2010, it refused to extend it again when the note matured on March 5, 2013. During its May 30, 2013 meeting, the Bitmicro board voted to initiate collection procedures on the note, and on May 31, 2013, Bitmicro served a demand notice on Bruce requesting immediate payment of the $183,853.53 note balance. Its demand letter also threatened to begin "the foreclosure process on the stock pledged under the Pledge Agreement" if he failed to pay the note in full within ten days.[3]

---

[3] Bruce's brothers purchased and financed similar amounts of stock from Bitmicro at or about the same time, and they all defaulted on these notes (collectively, the "Bruce Notes"). These defaults were strategically significant. Without these shares, the Bruces no longer represented a worrisome voting block of Bitmicro shares, thereby allowing Carson and Rankin to control the destiny of Bitmicro and BNII. The parties presented a considerable amount of evidence regarding whether the Bitmicro board extended the Bruce Notes' due dates. Virtually all of the witnesses who testified on the matter stated that the Bitmicro board never considered, and thus never agreed, to extend the maturity dates during its March 6, 2013 meeting (or during any other board meeting). The court finds these witnesses to be credible, and finds that the Bruce Notes were not extended.

While the Bruce brothers purchased and financed even more stock from Bitmicro in January 2006, the parties did not introduce the January 2006 notes, pledge agreements, and related default notices into evidence. The point to be made, however, is clear: Bruce owed Bitmicro substantial sums on promissory notes which he had expected would be extended and which he could not afford, in 2013, to repay.

Carson, through his own means, also began to exert financial pressure against Bruce. Bruce personally borrowed approximately $1.5 million from Carson to supplement his Bitmicro income. Bruce believed that he would repay the loan through a Bitmicro IPO or the sale of the company. Carson disagreed with this payment schedule, and in 2013 Carson demanded that Bruce repay the loans.

With control of the Bitmicro board in hand, Carson and Rankin sought to remove Bruce as a BNII officer and board member and thoroughly analyze the viability of the Toleno chip. During a special meeting of the Bitmicro board conducted on June 10, 2013, the board 1) discussed the steps necessary to foreclose on the Bruce Notes collateral;[4] 2) set a June 14, 2013 date for a special meeting of Bitmicro shareholders; and 3) resolved to seek the removal of the "entire existing board of directors and executive officers, including the corporate secretary and treasurer, of [BNII] and the appointment of new directors and executive officers as designated by the Company's Chief Executive Officers . . . ."

To accomplish this last resolution, Bitmicro scheduled an August 19, 2013 special meeting of the BNII shareholders and board directors. During these meetings, the shareholders removed the Bruce controlled board (the "Bruce Board") and elected a Bitmicro controlled board for BNII (the "Uriate Board"). The Uriate Board then terminated Bruce's position as BNII's president and chief operating officer. With this last act, Bitmicro's efforts to remove Bruce from positions of authority were seemingly complete.

Embittered by his ouster from Bitmicro, Bruce focused his efforts on BNII. In July 2013 Bitmicro retained an outside consultant who traveled to BNII's Philippines headquarters (with Bitmicro's general counsel) to review the Toleno chip with BNII's engineers. Bruce, who was still BNII's president (and who knew that Bitmicro owned the technology in question), barred the

---

[4] In May or June 2013, Bruce sued Bitmicro in Santa Clara Superior Court and obtained a temporary restraining order enjoining Bitmicro from foreclosing on the stock. The Santa Clara Superior Court thereafter denied Bruce's application for a preliminary injunction.

5

Case: 15-04047    Doc# 99    Filed: 04/06/17    Entered: 04/06/17 16:52:29    Page 5 of 14

consultant from meeting with the engineers absent a signed Non-Disclosure Agreement.[5] On July 30, 2013, Bruce circulated an email to all BNII employees reminding them that he was still in charge and that they were not to disclose any information to any third parties. The email, addressed to the "BNII Family," states in part that:

> "Notwithstanding the present issues affecting BITMICRO (US), there has been no change in the composition of Board of Directors and corporate officers of BNII. By express authority of the BNII Board of Directors, I am still your President. It has come to my attention that certain quarters claiming to represent [Bitmicro] have directed you to disclose BNII's most closely-guarded secrets to third parties, some of whom are our fiercest competitors. In this connection, all of you are sternly reminded of your contractual obligations under the Employee Proprietary Information and Assignment of Inventions Agreement which all of you had signed when you first joined BNII. Under the said Agreement, you are obligated to maintain the absolute secrecy of BNII's confidential and proprietary information, which include . . . proprietary designs and processes, corporate strategies, development projects, passwords, intellectual properties, etc. Your willful breach of the foregoing contractual obligation would hold you liable for the payment of considerable monetary damages amounting to millions of pesos."[6]

Bruce's defiance increased after the August 19, 2013 shareholder/board meetings. Bruce asserted that these meetings were not properly conducted under Filipino law, that the Bruce Board still controlled BNII and that he remained its president and chief operating officer. The Bruce Board then used corporate funds to retain attorneys who commenced litigation against the Uriate Board for declaratory relief that the August 19, 2013 meetings were invalid. While the litigation was filed with great fanfare on September 3, 2013, the Bruce Board did not vigorously pursue it.

On August 29, 2013, Bitmicro informed BNII's employees that Bitmirco had elected new directors and corporate officers for BNII, and that the new directors and officers intended to assess the current state of the subsidiary. By this time, the financial state of both parent and subsidiary was dire. Bitmicro remained dependent on ongoing cash infusions from Carson and Rankin, and it was struggling to pay its own employees. While Bitmicro had, in the past, delayed remitting funds to

---

[5] Bruce repeatedly reminded BNII's employees that he controlled the subsidiary. On September 3, 2013, Bruce (while still in America) addressed BNII's employees by Skype and exhorted them to obey him and to ignore the Uriate Board and its appointed officers.

[6] Bitmicro eventually met with BNII's engineers. The engineers informed Bitmicro that the Toleno chip was significantly flawed.

BNII, the evidence did not suggest that Bitmicro intended to terminate the Service Agreement and stop funding BNII.[7] Bitmicro was, however, leery about funding BNII while Bruce remained in control.

As a result, Bruce and his functionaries engaged in a disastrous game of financial chicken with Bitmicro in early September 2013 that ultimately led to the Bruce Board's decision to shut down BNII. On September 3, 2013, Gilbert Cunanan (who was BNII's IT director and the person appointed by Bruce to be his on-site charge d affaires) threatened Bitmicro that BNII would cease operations on September 3, 2013 if Bitmicro did not immediately fund its August 31, 2013 payroll. Bitmicro immediately responded with an email to all BNII employees which explained the precarious position that both companies now faced. The email, which was sent by Bitmicro's new CEO and board chairman, read as follows:

> "To all BNII employees:
>
> I am in receipt of Gilbert's letter (attached) and I find his actions to be reprehensible and reckless. He has continued to isolate BNII from the parent company and its employees and we have no visibility into the operations of anything related to BNII, including Max IO. He has absolutely no authority to act in his self appointed capacity. In fact, he has already been suspended by Zophar Sante, the COO of BNII and should not be present on the premises.
>
> We have a great group of employees at BNII and have every desire to continue operations and development of Max IO and are very excited about the future. However, by this attempted action, he has put each employee in harms way and has put the entire company at risk. I'm not sure what his objective is but the welfare of our employees and success of the company certainly is not it.
>
> Rey's improper advice along with Gilbert's insubordinate actions have placed us in the very difficult position we now face. We have done everything legally and appropriately. At this time, Rey has no position with BNII and, as I've already stated, Gilbert has been suspended. I also understand that threats have been made to anyone at BNII that shares any technological information with the parent company without Rey's written approval. This is nonsense as BNI owns all of the IP through a service agreement and Rey is operating without any authority.
>
> We will not give up on our fellow employees and on BNII and will take all necessary action to resolve this matter on behalf of all of our employees, the company and our shareholders."[8]

---

[7] In fact, BNII remains in existence to this day.

[8] Bitmicro presented evidence that an audit conducted by its outside auditors determined that BNII actually owed it $477,844.21. While Bitmicro informed BNII of this debt after Cunanan's

7

Case: 15-04047    Doc# 99    Filed: 04/06/17    Entered: 04/06/17 16:52:29    Page 7 of 14

Undeterred, Bruce and his minions barred the Uriate Board and the subsidiary's new officers from entering the premises on September 5th (which action, Cunanan stated, was on the advice of the Bruce Board's counsel). On September 8, 2013, Bruce informed Carson, Rankin and Shapowal by email that he was shutting down BNII. Bruce stated that:

> "In view of the current financial difficulties BNII is facing, I am left with no other choice but to declare a company holiday and temporarily stop BNII operations beginning Monday, September 9, 2013 (Manila Time).
>
> The payment BNII received from BNI-US was only sufficient for the net payroll of the people, and did not include payroll taxes, SSS, healthcare, and other employee benefits. As of August 31st, these payroll-related expenses already amount to PHP 6.9 million. Together with other BNII expenses necessary for operations, unpaid expenses already total PHP 18.7 million.
>
> BNII is heavily indebted to our landlord, utilities provider and major suppliers. BNII is in a precarious position not only with the companies we owe, but also with the Philippine Economic Zone Authority (PEZA) and other government agencies.
>
> Until BNII can collect from BNI-US, and with no clear word on payment, BNII is not in a position to require employees to come to work. The company will continue to demand payment of its receivables from BNI-US in order to have the necessary funds to pay outstanding salaries and other expenses, and to resume operations.
>
> The company holiday will continue until BNII receives payment of its receivables under the Service Agreement. Until such time, company resources will be shut down, including air conditioning and servers."

Bruce then informed BNII's employees by a September 9th email that the subsidiary was closing until September 30th. Bruce's email explained that "BNII Management released your payroll for August 31st on Friday, September 6, which represents payment for services you have already rendered. However, the payment we received from BNI-US does not include taxes, SSS, healthcare, other contributions and company expenses necessary for our operations, which places us in an inoperable situation."

Bruce did not have the Bruce Board's written approval to send either email. He testified, however, that the Bruce Board had discussed and approved the shutdown.

BNII shut down its operations on September 10, 2013. No employee was allowed on the premises, and the servers, which were critical to Bitmicro's own operations, were powered down.

---

demand letter, there was no evidence to suggest that Bitmicro intended to close BNII as a result of this audit.

8

BNII re-started operations in mid October after Bitmicro obtained a September 27, 2013 temporary restraining order against Bruce, Gilbert Cunanan and others. Bruce thereafter relinquished his Bitmicro board membership.

Bitmicro asserts that the shutdown caused it significant economic losses. The evidence demonstrates that Bitmicro incurred substantial out of pocket expenses, including the costs associated with 1) flying personnel to the Philippines to assess and reverse the shutdown; 2) employing security guards to protect BNII's premises; and 3) purchasing replacement servers and accounting software to operate its Fremont based operations and remain in contact with its military customers, which was Bitmicro's sole source of income. Bitmicro further claims that the BNII lease payments and wages that it paid during the shutdown also are recoverable damages, since it obtained no benefit from these payments.

The confusion caused by the management change and shutdown also had serious legal consequences for BNII. Many employees sued it for constructive termination, and the Philippines National Labor Relations Commission awarded them $867,264.38 in damages. This damages award forced BNII to file a bankruptcy proceeding in the Philippines. BNII proposes to fully pay these damages as part of its rehabilitation plan, and Bitmicro therefore seeks to recover the employees' damages award against Bruce. All told, Bitmicro asserts that its recoverable damages total approximately $1.8 million.

**The Law**

Bitmicro asserts that Bruce intentionally interfered with the Service Agreement and that his conduct was willful and malicious and thus non-dischargeable under Bankruptcy Code § 523(a)(6). Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." To establish its § 523(a)(6) claim, Bitmicro must prove "not only that the debtor acted willfully, but also that the debtor inflicted the injury willfully and maliciously rather than recklessly or negligently." *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1207 (9th Cir. 2001) (*citing Kawaauhau v. Geiger*, 523 U.S. 57, 64 (1998)). "Willful" and "malicious" are separate components, and Bitmicro must establish both elements by preponderance of the evidence. *Carillo v. Su, (In re Su)*, 290 F.3d 1140, 1146 (9th Cir. 2002); *Grogan v. Garner*, 498

9

Case: 15-04047    Doc# 99    Filed: 04/06/17    Entered: 04/06/17 16:52:29    Page 9 of 14

U.S. 279, 291 (1991). Willful and malicious conduct typically involves the commission of an intentional tort under state law. Herein, Bitmicro asserts that Bruce is liable in tort for intentionally interfering with its contractual relations with BNII. Exceptions to discharge must be narrowly construed in favor of dischargeability. Vol. 4 Collier On Bankruptcy, ¶523.05 (Alan N. Resnick & Henry J. Sommer eds., 16th ed).

California recognizes the tort of intentional interference with contractual relations. The tort has five elements: 1) a valid contract between plaintiff and a third party; 2) defendant's knowledge of this contract; 3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; 4) actual breach or disruption of the contractual relationship; and 5) resulting damages. *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.* (1984) 36 Cal.3d 752, 765-66; *Pac. Gas & Elec. Co. v. Bear Sterns & Co.* (1990) 50 Cal.3d 1118, 1126. Bitmicro has established each element. The Service Agreement was a valid contract; Bruce, as a former officer and director of both entities was intimately aware of its terms; Bruce's decision to shut down BNII was designed to and did actually disrupt the Service Agreement; and this disruption damaged Bitmicro. Despite his protests to the contrary, Bruce was a "third party" when he engineered the shutdown. Bitmicro included into evidence the expert opinion of Grace P. Quevedo-Panagsagan, an experienced Filipino attorney who specializes in Filipino corporate law. Her uncontroverted testimony establishes that Bitmicro and BNII's removal of the Bruce Board, installation of the Uriate Board, and termination of Bruce as an BNII officer were consistent with Filipino law. Bruce's decision to shut down BNII was therefore the action of a "rogue" former officer and director who lacked the authority to act on BNII's behalf.[9]

Bruce also argues that since Bitmicro "breached" the Service Agreement by failing to fully pay BNII's August 2013 operating costs, there was no valid contract. Bruce offered no case law to

---

[9] Bruce argues that he did not individually orchestrate or authorize the shutdown, and that he was simply acting on the Bruce Board's behalf. This court rejects this version of the events in question. First, Bruce and the Bruce Board had no authority to take any corporate steps affecting BNII. Moreover, Bruce dominated, controlled, and steered the Bruce Board in whatever direction he saw fit. The shutdown was his idea, and it was the ultimate act of retaliation and retribution against the individuals who removed him from the company that he founded and led for almost twenty years.

Case: 15-04047   Doc# 99   Filed: 04/06/17   Entered: 04/06/17 16:52:29   Page 10 of 14

support this position, and indeed, California law does not favor this argument. *See Whitney Inv. Co. v. Westview Dev. Co.* (1968) 273 Cal.App.2d 594, 602.

Bruce also contends that his conduct was "justified" since he could not ask BNII's employees to work when there were no assurances that Bitmicro would fully fund BNII's operations. Justification is an affirmative defense to Bitmicro's claim for relief, and Bruce has the burden of establishing its existence. *Lowell v. Mother's Cake & Cookie Co.* (1978) 79 Cal.App.3d 13, 19. While California courts describe the justification defense in various ways, its essence is that the interfering party must have acted in good faith in order to meet objectives that are more important that the interest interfered with. *See*, *e.g.*, *Richardson v. La Rancherita* (1979) 98 Cal.App.3d 73, 80-81; *Herron v. State Farm Mutual Ins. Co.* (1961) 56 Cal.2d 202, 206; *Los Angeles Airways, Inc. v. Davis*, 687 F.2d 321, 325 (9th Cir. 1982).

Bruce has not demonstrated that his conduct was justified. First, Bruce was not a BNII officer or director when he ordered the shut down. Second, Bruce did not act in good faith. Bruce knew months before September 9, 2013 that Bitmicro intended to exercise its majority shareholder rights to remove the Bruce Board and terminate Bruce as an officer of BNII, and that it was only a matter of time until its objectives became fact. Regardless of whether he believed that the Uriate Board had been rightfully elected, Bruce could have gracefully resigned from BNII and allowed Bitmicro to operate its subsidiary as it saw fit. Instead, Bruce forced Bitmicro into an untenable position of bending to his demand to fund a subsidiary that was controlled by Bitmicro's recently deposed chairman of the board and chief operating officer. Bitmicro wanted an operating BNII and was willing to fund it.[10] Its hesitance was due completely to Bruce and the Bruce Board's refusal to depart the premises and cede control. Since Bitmicro has continued to fund BNII during the several years since the 2013 shutdown, it is reasonable to conclude that Bruce's intransigence caused the shutdown, and that he was promoting his own interests (revenge) and not those of BNII's employees when he shuttered BNII's doors.

Bruce's conduct was willful and malicious. Under § 523(a)(6), a willful injury requires

---

[10] While whether Bitmicro wanted to operate BNII at the same capacity and with the same employee count is open to question, Bitmicro did not want BNII to shut down its operations.

11

"either a subjective intent to harm, or a subjective belief that harm is substantially certain." *In re Su*, 290 F.3d at 1144. Bruce's conduct was willful. At the very least, Bruce knew that shutting down BNII would cause financial chaos for Bitmicro. BNI's servers controlled Bitmicro's email and contained all of its financial and accounting data. Without these servers, Bitmicro could not function. In addition, Bruce intended to harm Bitmicro. While Bruce testified that he was simply trying to protect BNII's employees and that he would not risk the millions of Bitmicro shares that he and his family still owned, this court gives this testimony little credence. Bruce was an embittered former CEO and board member who found an opportunity to lash out at his former employer and investors and attempted to sell a cover story to immunize himself from liability. Given Bitmicro's financial struggles, Bruce knew that his shares had little market value. He further knew that he was the real impediment to Bitmicro's ongoing funding of BNII, and that his termination from BNII was imminent. Rather than recognizing the validity of the Uriate Board or simply stepping aside, Bruce used Bitmicro's reluctance to fund BNII as the means to shut it down and exact his revenge.

Bruce's conduct was also malicious. Under § 523(a)(6), an injury is malicious if the debtor a) commits a wrongful act, b) done intentionally, c) which necessarily causes injury and d) the act is done without just cause or excuse. *In re Su*, 290 F.3d at 1147. Bruce intentionally and wrongfully interfered with the Service Agreement, and his conduct was not justified or excusable. The interference also necessarily caused injury to Bitmicro.

Bitmicro is entitled to recover damages that will reasonably compensate it for the loss or harm caused by Bruce.[11] Stephen Uriate, Bitmicro's general counsel, testified at length regarding the damages sought by Bitmicro (see also Bitmicro Exh. 31). After some discussion, Uriate generally classified Bitmicro's expenses as "out-of-pocket" or "opportunity cost" damages. Uriate testified that Bitmicro suffered significant out of pocket expenses that it would not have incurred but for the shutdown. These expenses, which include but are not limited to security expenses, email hosting costs, consultant fees incurred in attempting to access the servers, and the living expenses for personnel flown to the Phillippines, total $78,709.73. This court award these damages to Bitmicro.

---

[11] Since Bitmicro fully funds BNII, the court is awarding damages to Bitmicro.

12

Bitmicro also argues that it is entitled to its so-called "opportunity cost" damages, which generally include BNII's normal operating costs, including wages and its real property lease. The court will not award these as damages. Bitmicro did not introduce any evidence demonstrating that BNII's shutdown resulted in lost profits or missed business opportunities. Simply, BNII (and thus Bitmicro) would have paid these expenses with or without the shutdown, and Bitmicro did not present any evidence that the forced absence of the BNII employees resulted in any lost revenue or profits.

Finally, Bitmicro seeks $222,832.57 in litigation expenses and the $867,264.38 in damages awarded by the Philippine Labor Relations Commission. Bitmicro has not persuaded this court by a preponderance of the evidence that these litigation expenses and award were caused by the shutdown alone. The plaintiffs in the constructive termination litigation appeared to include BNII employees who asserted that they were improperly demoted (at Bitmicro's behest) and denied their wages during the shutdown. If Lawrence Salazar's testimony is representative, these employees would have sued BNII regardless of the shutdown. While the shutdown certainly caused a significant amount of confusion and tension among BNII's labor force, this court cannot determine what portion of the Labor Relations Commission litigation and award arose from the shutdown. The evidence was similarly imprecise regarding Bitmicro's legal expenses. Bitmicro surely incurred legal expenses 1) when BNII obtained the temporary restraining order which led to Bruce and the Bruce Board's removal and 2) when BNII litigated before the Labor Relations Commission. While Bitmicro provided this court with the total for these two pieces of litigation, it did not explain how much it incurred in each. The fees for the former are recoverable damages herein; but (as stated above), Bitmicro has not proven that the attorneys fees incurred in defending against the Labor Relation Commission complaint constitute damages. Absent more detailed information, this court cannot speculate as to what percentage of these litigation costs and the employee damages it can award as damages herein.

Bitmicro shall prepare an appropriate judgment.

* * * END OF ORDER * * *

**COURT SERVICE LIST**

Rey H. Bruce
187 Clayton Avenue
San Jose, CA 95110

Rey Bruce
2 Jonathan Court
Warwick, NY 10990

Other recipients are ECF participants